# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

RYAN CLANCY,

                  **Plaintiff,**

        **v.**                                **Case No. 05-C-580**

**OFFICE OF FOREIGN ASSETS CONTROL
OF THE UNITED STATES DEPARTMENT
OF THE TREASURY; HENRY M. PAULSON,
Secretary of the United States Department of the
Treasury, in his official capacity;
ADAM J. SZUBIN, Director of the Office of
Foreign Assets Control, in his official
capacity; and ALBERTO R. GONZALES,
Attorney General of the United States
Department of Justice, in his official capacity,**

                  **Defendants.**

## DECISION AND ORDER

        This action for declaratory and injunctive relief arises out of a monetary penalty imposed on the Plaintiff, Ryan Clancy ("Clancy"), for engaging in certain prohibited transactions relating to Iraq between January 28, 2003, through early March 2003, in violation of the Iraqi Sanctions Regulations, 31 C.F.R. Part 575 ("Regulations").[1] Clancy brings this action for declaratory and injunctive relief against the Defendants, the Office of Foreign

---

[1] To place this action in historical context, the Court notes that, in late March 2003, the United States lead an invasion of Iraq to depose the regime of President Saddam Hussein, who was suspected of concealing weapons of mass destruction. After less than a month of fighting, United States led forces were in control of all the major cities and oil fields of Iraq, including its capital – Baghdad. On May 1, 2003, President George W. Bush declared an end to major combat operations. *See* "*United States Army,*" Microsoft® Encarta® Online Encyclopedia (2007), http://encarta.msn.com/text_761554065_0/US_ Army.html

Assets Control of the United States Department of the Treasury ("OFAC"); Henry M. Paulson ("Paulson"), Secretary of the United States Department of the Treasury, in his official Capacity; Adam J. Szubin ("Szubin"), Director of the OFAC, in his official capacity; and Alberto R. Gonzales ("Gonzales"), Attorney General of the United States Department of Justice, in his official capacity (collectively "the Defendants").

Eight causes of action are alleged by Clancy's complaint. It alleges that the OFAC deprived Clancy of property without due process of law in violation of the Fifth Amendment (First Cause of Action); the Regulations violate Clancy's right not to incriminate himself in violation of the Fifth Amendment (Second Cause of Action); the Regulations violate the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.* (Third Cause of Action); the Regulations violate Clancy's Fifth Amendment right to travel abroad (Fourth Cause of Action); the Regulations violate Clancy's First Amendment right to freedom of speech (Fifth Cause of Action); the Regulations violate Clancy's right to travel to foreign countries and his freedom of movement protected by Article 12 of the International Covenant on Civil and Political Rights ("ICCPR"), December 16, 1966, 999 U.N.T.S. 171 and customary international law (Sixth Cause of Action); the OFAC's finding that Clancy violated Section 575.205 of the Regulations must be reversed (Seventh Cause of Action); and, to the extent the Regulations do not exceed the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, *et seq.*, the IEEPA is an unlawful delegation of legislative authority to the executive branch, in violation of the separation of powers doctrine (Eighth Cause of Action).

2

Clancy's complaint includes allegations of selective enforcement, (*See* Compl. ¶¶ 45-46),[2] which are incorporated by reference into all eight substantive causes of action, but none of Clancy's causes of action are specifically designated as alleging selective enforcement. However, Clancy's fourth cause of action claiming a violation of his Fifth Amendment right to travel and his fifth cause of action claiming a violation of his First Amendment rights specifically refer to selective enforcement of the Regulations. (Compl. ¶¶ 57; 61.) Therefore, the Court will address Clancy's claim of selective enforcement in conjunction with those two claims.

The Defendants filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. In the alternative, the Defendants sought summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Defendants filed a certified copy of the administrative record ("A.R.") relating to the OFAC action against Clancy.

By decision and order dated August 24, 2006, this Court notified the parties that the Defendants' motion (Docket No. 12) would be considered as a motion for summary judgment and that they would be allowed a reasonable opportunity to present all material pertinent to the Rule 56 motion.

Prior to the deadline for filing his supplemental summary judgment submissions, on September 14, 2006, Clancy filed a motion seeking an extension of time to conduct limited discovery focusing on evidence to support his claim of selective prosecution and his

---

[2]Selective enforcement claims against federal entities arise under the Fifth Amendment due process clause. *See Bolling v. Sharpe,* 347 U.S. 497, 499 (1954)

interpretation of the term "services" in 31 C.F.R. § 575.205. The Defendants responded by seeking a protective order. By a January 8, 2007, Decision and Order, the Court granted the Defendants' motion for a protective order to the extent that Clancy would not be allowed to obtain the requested discovery and that Defendants would not be required to respond to those requests. The Court also established a revised schedule for the filing of supplemental submissions.

Those supplemental submissions have been filed. The Defendants' motion for summary judgment (Docket No. 12) is ready for resolution and is now addressed.

### SUMMARY JUDGMENT MOTION

The Defendants maintain that Clancy has not raised a genuine dispute of material fact and that, as a matter of law, they are entitled to summary judgment in their favor on each of Clancy's causes of action.

### Applicable Standard

When considering a motion for summary judgment, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A party "opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248; also citing *Celotex Corp.*, 477

4

U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *United States v. Rode Corp.*, 996 F.2d 174, 178 (7th Cir. 1993)).

"Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587.

### *Statutory and Regulatory Background*

In matters of foreign policy, the President of the United States of America is authorized to make broad use of economic powers. The United Nations Participation Act ("UNPA"), passed in 1945 and amended in 1949, provides that "[n]otwithstanding the provisions of any other law, whenever the United States is called upon by the Security Council to apply measures which said Council has decided, pursuant to article 41 of said Charter, are to be employed to give effect to its decisions under said Charter, the President may, to the extent necessary to apply such measures, through any agency which he may designate, and under such orders, rules, and regulations as may be prescribed by him to "investigate, *regulate, or prohibit, in whole or in part, economic relations* or rail, sea, air, postal, telegraphic, radio, and other means of communications *between any foreign country or any national thereof or any person therein and the United States or any person subject to the jurisdiction thereof,* or

5

involving any property subject to the jurisdiction of the United States." 22 U.S.C. § 287c(a) (emphasis added).

The IEEPA, passed by Congress in 1977, authorizes the President to exercise economic powers by declaring a national emergency with respect to "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a).[3]

In Executive Order 12,722, issued on August 2, 1990, President George H. W. Bush, found "that the policies and actions of the Government of Iraq constitute an unusual and extraordinary threat to the national security and foreign policy of the United States and . . . declare[d] a national emergency to deal with that threat." Exec. Order No. 12,722, 3 C.F.R. at 294 (1991).

On August 6, 1990, the United Nations Security Council issued Resolution 661, which called for member nations to restrict all economic transactions with Iraq. S.C. Res. 661(3)(c), U.N. SCOR., 45th Sess., 2933d mtg., U.N. Doc. S/RES/660 (Aug. 6, 1990). One

---

[3]As amended in 1994, the IEEPA provides that the President's authority under section 1701 does not include the authority to regulate or prohibit, directly or indirectly "*any transactions ordinarily incident to travel to or from any country*, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages." 50 U.S.C. § 1702(b)(4) (emphasis added). However, Congress specifically provided that the amendment to § 1702(b)(4) "shall not apply to restrictions on the transactions and activities described in section 203(b)(4) [subsec. (b)(4) of 1702] *in force on the date of enactment of this Act [Apr. 30, 1994], with respect to countries embargoed under the [IEEPA] on the date of enactment of this Act [Apr. 30, 1994]." See* Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. No. 103-236, § 525(c)(3), 108 Stat. 474,475 (1994) (codified in 50 U.S.C. § 1702 Note) (emphasis added).

week later, in light of United Nations Security Council Resolution No. 661, and to take additional steps with respect to Iraq's invasion of Kuwait and the national emergency declared in Executive Order 12,722, President Bush issued Executive Order 12,724 on August 9, 1990. Executive Order 12,724 directed economic sanctions including prohibiting the exportation of services to Iraq from the United States and prohibiting, with three specified exceptions, any transaction by a "United States person" relating to travel by a United States citizen to Iraq. Exec. Order No. 12,724, 3 C.F.R. at 297 (1991). The President authorized the Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including the promulgation of rules and regulations," to carry out the purposes of the order. Exec. Order No. 12,724, 3 C.F.R. at 297. Executive Order No. 12,724 also expressly authorized the Secretary of the Treasury to "redelegate" any of these functions to other officers and agencies of the Federal Government. Exec. Order No. 12,724, 3 C.F.R. at 298.

Thereafter, with respect to Iraq, Congress specifically authorized the President to implement economic sanctions as a foreign policy and national security measure. The Iraq Sanctions Act of 1990 ("Iraq Sanctions Act" or "Act") declares support for "the actions that have been taken by the President in response to [Iraq's invasion of Kuwait on August 2, 1990]." Pub. L. No. 101-513, § 586A(5), 104 Stat. 2047 (1990) (codified in 50 U.S.C. § 1701 Note). The Act further directs that "the President shall continue to impose the trade embargo and other economic sanctions with respect to Iraq and Kuwait that the United States is imposing, in response to Iraq's invasion of Kuwait, pursuant to Executive Orders Numbered 12724 and 12725 (August 9, 1990) and, to the extent they are still in effect, Executive Orders

Numbered 12722 and 12723 (August 2, 1990)." § 586C(a), 104 Stat. at 2048. The Act

further provides that, notwithstanding 50 U.S.C. 1705 and 22 U.S.C. 287c(b),:

> (1) a civil penalty of not to exceed $250,000 may be imposed on any person who, after the date of enactment of this Act [November 5, 1990], violates or evades or attempts to violate or evade Executive Order Numbered 12722, 12723, 12724, or 12725 or any license, order, or regulation issued under any such Executive order; and
> (2) whoever, after the date of enactment of this Act [November 5, 1990], willfully violates or evades or attempts to violate or evade Executive Order Numbered 12722, 12723, 12724, or 12725 or any license, order, or regulation issued under any such Executive order--
> (A) shall, upon conviction, be fined not more than $1,000,000, if a person other than a natural person; or
> (B) if a natural person, shall, upon conviction, be fined not more than $1,000,000, be imprisoned for not more than 12 years, or both.

§ 586E, 104 Stat. at 2049.

On January 18, 1991, the OFAC issued Regulations implementing the

prohibitions of Executive Orders 12,722 and 12,724[4] and setting forth procedures to govern

---

[4]In Executive Order No. 13,350, 3 C.F.R. 196 (2005), President George W. Bush, determined that the situation that gave rise to the declaration of a national emergency with respect to Iraq in Executive Order 12,722, had been significantly altered by the removal of the regime of Saddam Hussein and other developments and, therefore, terminated the national emergency declared in Executive Order Number 12,722, and revoked that Executive Order and Executive Order Number 12,724. However, Section 1 of Executive Order Number 13,350 specifically states:

> Termination of the national emergency declared in Executive Order 12722 shall not affect any action taken or proceeding pending but not finally concluded or determined as of the effective date of this order, any action or proceeding based on any act committed prior to such date, or any rights or duties that matured or penalties that were incurred prior to such date.

Exec. Order No. 13,350, 3 C.F.R. at 197. The effective date of Executive Order No. 13,350 is July 30, 2004. Exec. Order No. 13,350, 3 C.F.R. at 198.

Similarly, through regulations issued on June 23, 2003, and July 30, 2004, the OFAC lifted the majority of the prohibitions with respect to Iraq for transactions occurring on or after May 23, 2003. *See* 31 C.F.R. § 575.533.

8

violations. *See* Iraqi Sanctions Regulations, 56 Fed. Reg. 2112 (January 18, 1991). The Regulations prohibited exportation of goods and services from the United States and, with three exceptions, prohibited any United States person from engaging in any transaction relating to travel by any United States citizen to Iraq, or to activities by any United States citizen within Iraq. *Id.* The Regulations cite several sources of authority, including Exec. Order No. 12724, 55 Fed. Reg. 33089 (Aug. 13, 1990); the IEEPA, 50 U.S.C. § 1701 *et. seq.*; and the UNPA, 22 U.S.C. § 287c(a). 56 Fed. Reg. at 2113.

The Regulations provide that when the Director of the OFAC has reasonable cause to believe that a violation of any provision of part 575 has occurred and determines that further proceedings are warranted, he shall issue to the person concerned a "prepenalty notice" ("PPN") of his intent to impose a monetary penalty. 31 C.F.R. § 575.702(a).[5] The PPN must describe the violation, specify the laws and regulations allegedly violated, and state the amount of the proposed monetary penalty. 31 C.F.R. § 575.702(b)(1). The PPN must also inform the person of his right to make a written presentation within 30 days of mailing of the notice as to why a monetary penalty should not be imposed, or, if imposed, why it should be in a lesser amount than proposed. 31 C.F.R. § 575.702(b)(2); *see also* 31 C.F.R. § 575.703. After considering any presentations made in response to the PPN and any relevant facts, the Director determines whether or not there was a violation by the person named in the PPN. 31 C.F.R. § 575.704. If the Director determines that there was no violation, he promptly notifies the person in writing of the determination and that no monetary penalty will be imposed. 31

---

[5] Unless otherwise specified, all citations to the Iraqi Sanctions Regulations, 31 C.F.R. Part 575, are to the 2003 version of the Regulations.

9

C.F.R. § 575.704(a). Alternatively, if the Director determines that there was a violation by the person named in the PPN, he promptly shall issue a written notice of the imposition of the monetary penalty to that person. 31 C.F.R. § 575.704(b).

### *Material Facts*[6]

Clancy is a United States citizen and resides in this country. The administrative record contains evidence that Clancy departed from the United States on January 28, 2003, with Iraq as his ultimate destination and that Clancy arrived in Iraq on about February 5, 2003. According to the administrative record, while in Iraq, Clancy stayed at the Andalus Apartments – a hotel in Bagdad, Iraq – and at a food storage facility north of Bagdad. The administrative record contains evidence that, while in Iraq, Clancy served as a "human shield," protecting Iraqi facilities from possible United States military action.

The administrative record indicates that Clancy returned to the United States on March 7, 2003. From January 2003 through March 2003, Clancy did not have a license or any other form of authorization from the OFAC to engage in transactions with respect to Iraq or to export services to Iraq.

By a PPN dated July 8, 2004, the OFAC notified Clancy that it intended to impose a $10,000 civil penalty upon him for violating the travel-related restriction of the Regulations by engaging in transactions related to travel and transportation and for exporting services to Iraq by serving as a human shield. The PPN informed Clancy of his right to make a written presentation.

---

[6]These facts are based on the Defendants' statement of material facts, to the extent they are undisputed.

Clancy obtained extensions of time to respond to the PPN. Thereafter, through counsel, by a letter dated August 23, 2004, Clancy provided a written response to the PPN. Clancy's written response states:

> For the purposes of this response only, and without waiving his right to object or deny OFAC's allegations in future proceedings, Mr. Clancy will accept as true the allegations that he departed the United States for Iraq on January 28, 2003, and that he returned to the United States on March 7, 2003. He neither admits nor denies OFAC's remaining allegations.

(A.R. 0005.) Clancy's written presentation challenges the PPN "both factually and legally." (A.R. 0006.)

By a penalty notice dated March 28, 2005, the OFAC found that Clancy violated the Regulations as set forth in the PPN and imposed a civil penalty of $8,000 stating:

> After consideration of the entire record, OFAC finds you did violate the Regulations as set forth in the [PPN]. Balancing the mitigating against aggravating factors, it is further determined that some mitigation is warranted to reflect that this is your first offense on record at OFAC and you provided a written response to the [PPN]. However, it is further determined that an aggravating factor is presented inasmuch as you had knowledge of the law with respect to the Iraq sanctions and you willfully violated it. Accordingly, the proposed CMP [civil monetary penalty] in the amount of $10,000 is hereby reduced by 20% to $8,000, which is a penalty amount imposed upon you pursuant to the Regulations.

(A.R. 0002.)

### *Analysis*

Before addressing the substance of the Defendants' summary judgment motion, the Court considers Clancy's opposition to the Defendants' proposed finding of fact that the administrative record contains evidence that, while in Iraq, Clancy served as a "human shield,"

protecting Iraqi facilities from possible United States military action.  Clancy relies upon his declaration, which states, "I do not understand what definition Defendants have given the term 'human shield' in this context; however, regardless of definition, I did not serve as a 'human shield' for anyone or anything."  (Clancy Decl. ¶ 4.)  He avers that he "shielded no Iraqi 'facilities' from anything, much less possible U.S. military action."  (*Id*. ¶ 5.)  Clancy also avers that he is "not aware of any U.S. military action directed toward civilian structures or areas in February of 2003."  (*Id*.)

In responding to a summary judgment motion, the non-moving party may not simply reiterate the allegations contained in the pleadings.  *Larsen v. City of Beloit*, 130 F.3d 1278, 1282 (7th Cir.1997).  "The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.*"  Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).  "It is well settled that conclusory allegations . . . without support in the record, do not create a triable issue of fact."  *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) (citing *Patterson v. Chi. Ass'n for Retarded Citizens*, 150 F.3d 719, 724 [7th Cir. 1998]).  Clancy's conclusory self-serving statements that he did not serve as a "human shield" for any Iraqi facilities or that he is not aware of any United States military action directed toward civilian structures or areas in February of 2003, do not create a genuine dispute regarding the evidence contained in the administrative record.[7]

_____

[7]However, Clancy's presence is characterized, Clancy was in Iraq from January 2003, through March 2003, without a license or any other form of authorization from the OFAC to engage in a transaction with respect to Iraq.

12

*Procedural Due Process  -  First Cause of Action*

The Defendants assert that Clancy was afforded procedural due process. Clancy contends that the process outlined by the Regulations violates his Fifth Amendment right to procedural due process because it does not provide for a neutral decisionmaker, discovery concerning the OFAC's evidence against him, an opportunity to call or cross-examine witnesses, or to be heard orally before the OFAC or any other decisionmaker. He states that the "sparse process" provided by the Regulations contrasts dramatically with the comprehensive notice and hearing procedures available to those charged with traveling to Cuba in violation of the Cuban Assets Control Regulations.

The Due Process Clause of the Fifth Amendment provides that "no person shall . . . be deprived of life, liberty or property, without due process of law." U.S. CONST. AMEND. V. The ordinary mechanism for determining the procedures that are necessary to ensure that a citizen is not "deprived of life, liberty, or property, without due process of law," U.S. CONST. AMEND. V, is the test articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See Hamdi v. Rumsfeld*, 542 U.S. 507, 528-29 (2004). *Mathews* dictates that the process due in any given instance is determined by weighing "the private interest that will be affected by the official action" against the Government's asserted interest, "including the function involved" and the burdens the Government would face in providing greater process. *Id.* (quoting *Matthews*, 424 U.S. at 335). The *Mathews* calculus then contemplates a careful balancing of these concerns, through an analysis of "the risk of an erroneous deprivation" of the private interest if the

13

process were reduced and the "probable value, if any, of additional or substitute procedural safeguards." *Id.*

In this case, Clancy's interest at stake is an $8,000 civil penalty – a deprivation of a property interest.[8] The governmental function relates, in part, "to the conduct of the United States's foreign relations . . . so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *See Regan v. Wald*, 468 U.S. 222, 242 (1984) (citation omitted). It also relates to national security: the most compelling governmental interest. *See Haig v. Agee*, 453 U.S. 280, 307 (1981).

The creation of the regulatory scheme to implement the prohibitions on travel to Iraq by United States citizens and the exportation of services to Iraq was authorized by the President and his actions were approved by Congress. While the Defendants have not addressed the burdens they would face if greater process were provided, extremely significant national security and foreign policy interests were at stake. While Clancy states that additional process would have reduced the risk of an erroneous deprivation of his interests, the probable value, if any, of the additional or substitute procedural safeguards is a matter of conjecture.

The Regulations require an initial determination by the OFAC Director that there is reasonable cause to believe a violation has occurred and then notice of that determination to the alleged violator. 31 C.F.R. § 575.702. The notice must include a description of the violation, specify the laws and regulations allegedly violated, and the amount of the proposed penalty. *Id.* The notice also must inform the alleged violator of the right to make a written

_____

[8]Clancy faced a potential fine of up to $275,000. (*See* A.R. Correspondence, Tab 8, 1 n.1.)

14

presentation within 30 days. *Id*. The OFAC Director is required to consider the alleged violator's written presentation and the relevant facts to determine whether there has been a violation and to notify the alleged violator in writing of whether or not a penalty will be imposed. 31 C.F.R. § 575.704.

Clancy believes that he is entitled to discovery.[9] However, there is no constitutional right to pretrial discovery in administrative proceedings. *Kelly v. U.S. E.P.A.*, 203 F.3d 519, 523 (7th Cir. 2000); *Silverman v. Commodity Futures Trading Comm'n*, 549 F.2d 28, 33 (7th Cir. 1977). The Administrative Procedure Act contains no provision for pretrial discovery in the administrative process and the Federal Rules of Civil Procedure for discovery do not apply to administrative proceedings. *Id*.

The need for an oral hearing and the opportunity to question witnesses are related. Administrative agencies are not required to provide "a hearing closely approximating a judicial trial." *Nat'l Council of Resistance of Iran v. Dep't of State,* 251 F.3d 192, 209 (D.C. Cir. 2001) (citing *Mathews*, 424 U.S. at 333.) In that case, the appeals court held that the Secretary of State was required to afford to entities considered for imminent designation as foreign terrorist organizations under the AEDPA, the opportunity to present, at least in written form, such evidence as those entities may be able to produce to rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations. *Id*. Clancy was afforded an opportunity to present a written rebuttal.

---

[9]The administrative record indicates that Clancy made a request for information pursuant to the Freedom of Information Act ("FOIA"). (A.R. 0004). That request included a request for "all OFAC and Treasury records concerning Mr. Clancy; policies, procedures, and guidelines concerning travel to Iraq; and, statistical information on individuals who allegedly traveled to Iraq in violation of the regulations." (*Id*.)

Here, the challenged action was taken pursuant to the statutorily authorized and Congressionally ratified sanctions program. Such action flows from a Presidentially declared national emergency. *See Holy Land Found. for Relief and Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 76 (D.D.C. 2002). A Presidentially declared national emergency justifies diminished procedural due process guarantees. *See id*.

Clancy compares the process afforded to him to that afforded by the Cuban Assets Control Regulations ("Cuban Regulations"), 31 C.F.R. pt. 515 (1963). The Cuban Regulations were implemented under the Trading With the Enemy Act of 1917 ("TWEA"), 40 Stat. 411, as amended, 50 U.S.C. App. § 1 *et seq. See Regan v. Wald*, 468 U.S. 222, 225 (1984). The Iraqi Sanctions Regulations are not premised in whole or part upon the TWEA.

The TWEA was amended in 1992 to require that the civil penalties described by that section may be imposed only on the record after opportunity for an agency hearing, in accordance with sections 554 through 557 of title 5 of the United States Code, with the right to prehearing discovery. *See* National Defense Authorization Act for Fiscal Year 1993, Pub. L. No. 102-484, Div. A, Title XVII, § 1710(c), 106 Stat. 2580-81 (1992). There is no analogous requirement set forth in the statutes which provide the authority for the Iraqi Sanctions Regulations. Congress could have done so if deemed prudent. Thus, the Court concludes that the opportunity for a written presentation afforded by the Regulations satisfies procedural due process requirements, and that, under these circumstances, no oral hearing or opportunity to question and cross-examine witnesses was required. *Accord Karpova v. Snow*, 402 F. Supp. 2d 459, 470-71 (S.D.N.Y. 2005).

The final component of Clancy's due process challenge relates to the Director of the OFAC who both initiates the charges and makes the final determination of whether a violation has occurred. The right to a fair hearing conducted by an impartial tribunal is the "heart of due process." *Bakalis v. Golembeski*, 35 F.3d 318, 324 (7th Cir. 1994). "Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'" *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (citations omitted).

The Supreme Court in considering a procedural due process challenge to the actions of a medical examining board that first had conducted an investigative hearing to determine whether a doctor had engaged in certain proscribed acts, and then was to conduct a contested hearing to determine whether the doctor's license to practice medicine should be revoked, held:

> The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is adequately implemented.

421 U.S. at 40-41, 47. *See also Bakalis*, 35 F.3d at 324.

Clancy has presented no evidence that the OFAC Director harbored any actual bias or prejudged the matter. *Id*. Rather, the record indicates that the Director considered Clancy's arguments and reduced the penalty by 20%. Clancy has not overcome the

17

presumption that the Director acted with honesty and integrity. *Withrow*, 421 U.S. at 47. As a matter of law, the Defendants are entitled to summary judgment in their favor on Clancy's procedural due process cause of action.

*Fifth Amendment Right Against Self-Incrimination - Second Cause of Action*

The Defendants contend that Clancy was not deprived of the Fifth Amendment privilege against self-incrimination simply because he had to choose whether to assert it. Further, he failed to assert it and, even assuming for the purpose of argument that he did, he made factual assertions about the trip which led to its forfeiture.

Clancy contends that the OFAC violated his privilege against self-incrimination, because although it had the ability to do so, the OFAC made no effort to accommodate his privilege and, consequently, forced Clancy to respond to the PPN on legal grounds alone.

While the Fifth Amendment states only that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," U.S. CONST. AMEND. V, there is no question that an individual is entitled to invoke the privilege against self-incrimination during a civil proceeding. *See, e.g., Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973) (explaining that the Fifth Amendment permits an individual "not to answer official questions put to him in any . . . proceeding, civil or criminal, formal or informal, where the answer might incriminate him"); *U.S. v. Certain Real Prop. and Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 82 (2d Cir. 1995). However, even in the criminal context where an individual's liberty is at stake, the Supreme Court has noted that "there are undoubted pressures – generated by the strength of the government's case against him – pushing the criminal

defendant to testify." *Ohio Adult Parole Auth. v. Woodard* 523 U.S. 272, 287 (1998). But, stated the Supreme Court, it "has never been suggested that such pressures constitute 'compulsion' for Fifth Amendment purposes." *Id.*

In arguing the motion on this cause of action, both parties refer to facts which, at least in part, are documented by the administrative record. But, neither party submitted proposed factual findings which address, as relevant to Clancy's Fifth Amendment claim, what transpired before the OFAC. Since there are no "facts" before the Court and Clancy has the burden of presenting facts upon which a reasonable jury could find in his favor at trial, this Court could grant the Defendants' motion for summary judgment on that basis.

However, reference to the administrative record on file discloses that by letter dated August 4, 2004, Clancy requested that the OFAC and the United States Government (1) grant him immunity from (or agree to waive) criminal prosecution with respect to the allegations contained in the July 8, 2004, PPN or (2) stay all proceedings arising out of the PPN until the applicable statute of limitations for criminal prosecutions based on the allegations expired. (A.R. 0026). The administrative record does not disclose that the OFAC responded to Clancy's request.[10]

The OFAC's response (or failure to provide a response) may have placed pressure upon Clancy to respond to the PPN and may have influenced Clancy's response, but any resultant pressure did not violate Clancy's right against self-incrimination. *See Ohio Adult*

---

[10]The complaint alleges that the OFAC provided an informal response that it would not grant the request because it could not bind the United States Department of Justice. (Compl. ¶ 35.) Allegations in the complaint do not suffice to overcome summary judgment. *Doe*, 30 F.3d at 883.

*Parole Auth.*, 523 U.S. at 287. Thus, summary judgement as a matter of law in favor of the Defendants is granted on Clancy's Fifth Amendment self-incrimination claim.

### The Regulations Violate the APA - Third Cause of Action

Citing the IEEPA, the UNPA and the Iraqi Sanctions Act, the Defendants contend that there are multiple, separate Congressional authorizations, for the actions taken by the President in Executive Order 12,724 and in the Regulations issued pursuant to that order. Clancy counters that none of the cited statutes authorize a " blanket travel ban" and that consequently the travel regulation is invalid and the OFAC may not penalize Clancy for violating it.

Courts defer to legislative regulations, such as the Regulations at issue, unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law." *Black v. Educ. Credit Mgmt. Corp.*, 459 F.3d 796, 799-800 (7th Cir. 2006) (quoting 5 U.S.C. § 706(2)(A)). This is a narrow standard of review, under which the Court's task is only to determine whether the agency's action "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Black*, 459 F.3d at 800 (quoting *Head Start Family Educ. Program, Inc. v. Coop. Educ. Serv. Agency 11*, 46 F.3d 629, 633 (7th Cir.1995) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))). If the agency "articulate[s] grounds indicating a rational connection between the facts and the agency's action, then [the Court's] inquiry is at an end." *Id*.

Case 2:05-cv-00580-RTR   Filed 03/31/07   Page 20 of 42   Document 45

Section 575.207, the challenged travel regulation, states:

> Except as otherwise authorized, no U.S. person may engage in any transaction relating to travel by any U.S. citizen or permanent resident alien to Iraq, or to activities by any U.S. citizen or permanent resident alien within Iraq, after the effective date, other than transactions:
> (a) Necessary to effect the departure of a U.S. citizen or permanent resident alien from Kuwait or Iraq;
> (b) Relating to travel and activities for the conduct of the official business of the United States Government or the United Nations; or
> (c) Relating to journalistic activity by persons regularly employed in such capacity by a newsgathering organization.
>
> This section prohibits the unauthorized payment by a U.S. person of his or her own travel or living expenses to or within Iraq.

31 C.F.R. § 575.207.

The IEEPA, which authorizes the President to exercise economic powers by declaring a national emergency with respect to "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat," 50 U.S.C. § 1701(a), alone, grants the President "sweeping powers" and "broad authority." *See Paradissiotis v. Rubin*, 171 F.3d 983, 988 (5th Cir. 1999) (upholding Libyan sanctions regulations). A challenge to the Regulations as being outside the scope of the IEEPA was rejected in summary fashion in *Karpova*, 402 F.Supp. 2d at 469. Travel to Iraq and a concomitant presence in Iraq, obviously, would economically impact Iraq.

To the extent that *Sacks v. Newcomb*, 466 F.3d 764, 775 (9th Cir. 2006), *petition for cert. filed*, 75 U.S.L.W. 3385 (U.S. Jan. 8, 2007) (No. 06-945), calls into question the authority afforded by the IEEPA for the travel regulation,[11] Clancy would still not prevail on his challenge to § 575.207, as violating the APA. Executive Order 12,724 which instructed the Treasury Secretary or his designee to promulgate regulations enforcing the economic sanctions was also authorized by the UNPA. *See Sacks*, 466 F.3d at 775-77 (relying on the UNPA and concluding that the IEEPA did not constitute a partial *sub silentio* repeal of the UNPA); *Office of Foreign Assets Control v. Voices in the Wilderness*, 329 F. Supp. 2d 71, 78 (D.D.C. 2004) (holding that Executive Order 12,724 and the Iraqi Sanctions Regulations fall under the purview of the UNPA, given the United Nations requirement that member states participate in the Iraqi Sanctions program). Therefore, the Court grants summary judgment in favor of the Defendants on Clancy's third cause of action asserting that the Regulations violate the APA.

### *Fifth Amendment Right to Travel - Fourth Cause of Action*

The Defendants assert that a Fifth Amendment right to travel claim made under similar circumstances, based on an alleged fundamental right to international right to travel, was rejected in *Wald*, 468 U.S. at 240-44. Clancy counters that his Fifth Amendment right to travel claim is governed by *Aptheker v. Sec. of State*, 378 U.S. 500, 505-06 (1964) and *Kent v. Dulles*, 357 U.S. 116, 125-27 (1958), not *Wald*.

---

[11] *Sacks* did not address the grandfathering provisions for the application of the amendment to 50 U.S.C. § 1702(b). *See* Note 3 *infra* at 6.

*Kent* held that Congress had not authorized the Secretary of State to inquire of passport applicants as to affiliation with the Communist Party. 357 U.S. at 129-30. *Aptheker*, 378 U.S. at 514, held that a provision of the Subversive Activities Control Act of 1950, 64 Stat. 993, forbidding the issuance of a passport to a member of the Communist Party, swept "too widely and too indiscriminately across the liberty guaranteed in the Fifth Amendment."

The following term in *Zemel v. Rusk*, 381 U.S. 1 (1965), the Supreme Court qualified both *Kent* and *Aptheker*. *Zemel* rejected First and Fifth Amendment challenges to the Secretary of State's refusal to validate passports of United States citizens for travel to Cuba following the break in diplomatic and consular relations between the United States and Cuba in 1961. 381 U.S. at 15-16. The Supreme Court emphasized that no effort was made by the Secretary of State to deny passports on the basis of political belief or affiliation. 381 U.S. at 16-17. Distinguishing *Kent*, the Supreme Court stated:

> It must be remembered . . . that the issue involved in *Kent* was whether a citizen could be denied a passport because of his political beliefs or associations. . . . In this case, however, the Secretary has refused to validate appellant's passport not because of any characteristic peculiar to appellant, but rather because of foreign policy considerations affecting all citizens."

381 U.S. at 13.

The Supreme Court observed that while the challenged refusal to validate passports effectively prevented travel to Cuba, and thus inhibited the gathering of information regarding Cuba, no First Amendment rights of the sort that controlled in *Kent* and *Aptheker* were implicated by the across-the-board restriction in *Zemel*. 381 U.S. at 17. And, the Court

found the Fifth Amendment right to travel, standing alone, was insufficient to overcome the national security justifications supporting the restriction. 381 U.S. at 15-16. ("That the restriction which is challenged in this case is supported by the weightiest considerations of national security is perhaps best pointed up by recalling that the Cuban missile crisis of October 1962 preceded the filing of appellant's complaint by less than two months.")

In *Wald,* the Supreme Court upheld restrictions on travel-related transactions with Cuba imposed by the 1982 amendment to a Treasury Department regulation restricting travel to Cuba by permitting only certain types of travel and excluding general tourist and business travel. 468 U.S. at 244. Addressing the respondents' claim that the amended regulation violated their right to travel guaranteed by the Due Process Clause of the Fifth Amendment, the Supreme Court distinguished its prior decisions in *Aptheker* and *Kent*. 468 U.S. at 240-41. The Supreme Court saw no reason to differentiate between the challenge presented to the travel restrictions imposed by the President and the passport restrictions imposed by the Secretary of State in *Zemel* – both had the practical effect of preventing travel to Cuba by most American citizens, and both were deemed to be justified by "weighty concerns of foreign policy." *Wald*, 468 U.S. at 242.

The *Wald* Court noted that in *Kent*, 357 U.S. at 126-27, it had treated the constitutional right to travel within the United States and the right to travel abroad indiscriminately — a position rejected in subsequent decisions. *Wald*, 468 U.S. at 241 n.25 (citing *Haig*, 453 U.S. at 306 (stating "the freedom to travel outside the United States must

be distinguished from the right to travel within the United States"); *Califano v. Aznavorian*, 439 U.S. 170, 176-77 (1978).

Presently, the "'right' of international travel has been considered no more than an aspect of 'liberty' protected by the Due Process Clause of the Fifth Amendment," which may "be regulated within the bounds of due process." *See Haig*, 453 U.S. at 307 (citation omitted). Furthermore "it is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Id.* (citation omitted).

The limitations imposed by the Iraqi Sanctions Regulations are similar to those imposed by the 1982 amendment to the Cuban Regulations. The Regulations do not selectively deny passports on the basis of political belief or affiliation, but curtail travel to Iraq in the wake of Iraq's invasion of Kuwait. The foreign policy implications of that decision and the presumptive constitutionality of travel restrictions outweigh any countervailing interest of Clancy in international travel. Clancy's Fifth Amendment substantive due process right to international travel claim is akin to those rejected in *Zemel* and Wald. Therefore, the Court grants summary judgment for the Defendants on this cause of action. *Accord*, *Karpova*, 402 F. Supp. 2d at 471-72.

Clancy's Fifth Amendment right to travel claim also includes a selective enforcement component. A proponent of a selective enforcement claim must meet the same "ordinary equal protection standards" outlined in *United States v. Armstrong*, 517 U.S. 456, 468 (1996), for selective prosecution claims. *See United States v. Barlow*, 310 F.3d 1007, 1010 (7th Cir. 2002) (applying *Armstrong* standard to discovery on selective enforcement

claim). A selective prosecution claim is an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution. *Armstrong*, 517 U.S. at 468. " "[T]he essential elements of the [selective prosecution] defense, [are] discriminatory effect and discriminatory intent." *Id.* (internal quotations omitted)(citation omitted).

Attached to Clancy's opposition brief is an internet news article comparing Clancy's experiences in Iraq to those of Ken Joseph Jr., ("Joseph"), another American who traveled to Iraq to protect the Iraqis against allegedly unwarranted American aggression but "had a vastly different experience" and "left Iraq to smuggle out tapes of interviews with Iraqis to tell the world of their plight." (*See* Att. 1-4 (Larry Elder, A Tale of Two American Anti-War Activists, World-Net Commentary (April 3, 2003), http://www.worldnetdaily.com/news/article.asp? ARTICLE ID 31860), Pl.'s Br. Opp'n Defs.' Mot. Dismiss or S.J.) The internet news article is not included in the material facts or the administrative record.

While the Defendants have not objected to the Court's consideration of the internet news article, to the extent it is offered to establish the truth of the matter asserted – that Joseph traveled to Iraq – it is inadmissible hearsay (actually hearsay within hearsay) and may not be considered by the Court on summary judgment. *See Chicago Firefighters Local 2 v. City of Chi.*, 249 F.3d 649, 654 (7th Cir. 2001); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (finding a newspaper article to be inadmissible hearsay and confirming that hearsay evidence is inadmissible at the summary judgment stage in the same way it is inadmissible at trial). Moreover, even if the internet news article was considered, it does not contain any facts indicating that Joseph could have been sanctioned under the Regulations.

Clancy also relies upon the administrative record, which contains redacted names of others investigated by the OFAC. (A.R., Correspondence, Tab 7, 33-34.) While Clancy did not propose any facts based on that record, the Defendants have not objected to the consideration of the redacted names and they submitted the entire administrative record in support of their summary judgment motion.

Regardless, the redacted information about others investigated by the OFAC contains no facts about the activities or views of persons whom the OFAC also investigated, or the outcome of those OFAC investigations. Thus, despite construing the evidence in the light most favorable to Clancy, he has not presented facts upon which a reasonable jury could conclude that others were similarly situated to him and that penalties could have been imposed but were not. *See Voices in the Wilderness*, 329 F. Supp. 2d at 83. Therefore, the Court grants summary judgment to the Defendants on Clancy's Fifth Amendment right to travel/selective enforcement cause of action.

*First Amendment Freedom of Speech-Fifth Cause of Action*

The first step in the Court's analysis of the fifth cause of action is to determine whether the First Amendment is implicated. If the First Amendment is implicated, the parties are in apparent agreement that the challenged Iraqi Sanctions Regulations are content-neutral and the Court should apply the intermediate scrutiny test outlined in *United States v. O'Brien*, 391 U.S. 367, 376 (1968).[12]

---

[12]In general, once a court determines that the First Amendment is implicated, then it must determine whether the challenged law or regulation is content-based or content-neutral. The answer to that question determines the level of constitutional review applicable to the law or regulation – if it is content-based, the Court is to apply heightened scrutiny – if the regulation is content-neutral, the Court is to apply the intermediate level of scrutiny. *See* 1 Rodney A. Smolla, *Smolla and Nimmer on Freedom of Speech*, §§ 3:1-3:2 (2006).

In considering whether the First Amendment is implicated, the Court notes that *Zemel* rejected the contention that the refusal to validate Zemel's passport for travel to Cuba by the Secretary of State denied him rights guaranteed by the First Amendment. Zemel contended that the travel ban was "'a direct interference with the First Amendment rights of citizens to travel abroad so that they might acquaint themselves . . . with the effects abroad of our Government's policies, foreign and domestic, and with the conditions abroad which might affect such policies.'" 381 U.S. at 16-17. While agreeing that the refusal to validate passports to Cuba inhibited the free flow of information about that country, the Supreme Court held that the right to speak and publish does not carry with it the unrestrained right to gather information. *Id*. at 17.

*Zemel* involved a First Amendment claim that the prohibition on international travel impeded the gathering of information, *see* 381 U.S. at 17, and *Freedom to Travel v. Newcomb*, 82 F.3d 1431, 1441 (9th Cir. 1996), involved a First Amendment claim based on the "exact argument" rejected in *Zemel*.

However, Clancy's First Amendment claim is distinguishable from the *Zemel* and *Freedom to Travel* claims. He does not claim that the general travel ban impedes his ability to gather information about a foreign country[13] – but rather that his "alleged travel to

_____

[13]*Walsh v. Brady*, 927 F.2d 1229, 1235 (D.C. Cir. 1991), relied on *Zemel* in rejecting a First Amendment strict scrutiny challenge by a poster importer to the Cuban Asset Control Regulations' preclusion of payment for travel to Cuba to obtain posters, but did not end its First Amendment analysis. The court continued its analysis under *O'Brien*, pointing out that three years **after** *Zemel,* the Supreme Court established standards for evaluation of government restrictions that are unrelated to the suppression of expression but that burden First Amendment freedoms incidentally. *Id*. (citing *O'Brien*, 391 U.S. at 376)) (emphasis added.) The *Walsh* court implies that if the *O'Brien* test had existed when *Zemel* was before the Supreme Court, the test would have been applied.

Iraq indubitably communicated the specific message that Mr. Clancy supports peace, and he believes that innocent Iraqi civilians should not be harmed either by a U.S. military strike or by the Iraqi regime." (Pl.'s Br. Opp'n Defs.' Mot. Dismiss or S.J. 26.) Stated somewhat differently, Clancy claims that his alleged travel to Iraq was protected by the First Amendment because his travel communicated his beliefs about the situation in Iraq.

Clancy does not maintain that the OFAC's purpose in issuing the Regulations or the challenged penalty was to regulate the content of their expressive activity and, indeed, it is clear that they were not. The penalty was issued to enforce the general ban on traveling to Iraq and providing goods or services to Iraq as implemented through the Regulations.

While the First Amendment claim is tenuous, the regulatory scheme may be viewed as having the incidental effect of burdening speech, and the Court will analyze it under the four-prong test established in *O'Brien*, 391 U.S. at 367. *See Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1057 (7th Cir. 2004). The *O'Brien* test applies an intermediate level of scrutiny to content-neutral government regulations affecting speech. *Id*. These intermediate scrutiny tests can be applied only to governmental regulation of conduct that has an expressive element or to regulations directed at activity with no expressive component but which nevertheless impose a disproportionate burden on those engaged in protected First Amendment activity. *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 703-04 (1986); *Hodgkins*, 355 F.3d at 1057.

"When 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element

can justify incidental limitations on First Amendment freedoms." *O'Brien*, 391 U.S. at 376. Under the four prong *O'Brien* test: (1) "a government regulation is sufficiently justified if it is within the constitutional power of the Government;" (2) "if it furthers an important or substantial governmental interest;" (3) "if the governmental interest is unrelated to the suppression of free expression;" and (4) "if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id*. at 376-77.

As to the first prong, the Regulations clearly fall within the constitutional power of the government, as they were implemented pursuant to the authority granted by Executive Orders 12,722 and 12,724, and the IEEPA, UNPA and the Iraqi Sanctions Act. *See Miranda v. Sec'y of Treasury*, 766 F.2d 1, 3 (1st Cir. 1985) ("It is a basic principle of our system of government that, when acting pursuant to Congressional authorization in the field of foreign affairs, the President commands all the political authority of the United States."); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936). Clancy does not contest the existence of constitutional power for enacting and implementing appropriate sanctions against other nations.

As to the second prong, an important or substantial governmental interest, "[i]t is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig*, 453 U.S. at 307. Clancy states that the government has a strong interest in security and foreign policy and agrees that economic sanctions against Iraq may further a substantial governmental interest. (Pl.'s Br. Opp'n Defs.' Mot. Dismiss or S.J. 27.)

Clancy contests the third prong, which inquires whether "the governmental interest is unrelated to the suppression of free expression." *O'Brien*, 391 U.S at 376-77. He contends that in its *enforcement* of the Regulations, the government appears to be pursuing an interest directly related to the suppression of free expression. Clancy states that the OFAC apparently has penalized only individuals who spoke out about their experience as human shields and publically opposed the government's war policies. Clancy's assertion is unsupported. The redacted correspondence in the administrative record does not provide factual support for Clancy's claim that the OFAC has only penalized persons who voiced opposition to the government's "war policies."

Moreover, the third prong of *O'Brien* test inquires about the *reasons advanced by the government to justify the law* and requires that they be grounded solely in the noncommunicative aspects of the conduct being regulated. The governmental purpose is to stop the flow of money, tangibles and intangibles into Iraq as retribution for Iraq's invasion of Kuwait. This governmental foreign policy and national security purpose is unrelated to the suppression of free expression. Thus, this Court concludes that the third prong of the *O'Brien* test has been satisfied – the governmental interest in imposing economic sanctions on Iraq to alleviate the perceived threat posed by Iraq to our national security and as a foreign policy matter because Iraq invaded Kuwait is clearly unrelated to the suppression of free expression. "[R]estricting the flow of information or ideas is not the purpose of the regulations. The restriction of first amendment freedoms is only incidental to the proper general purpose of the

regulations: restricting the dollar flow to hostile nations." *See Teague v. Reg'l Comm'r of Customs*, 404 F.2d 441, 445 (2d Cir. 1968).

Clancy also contends that the Regulations do not meet the fourth prong of the *O'Brien* test – he asserts that an absolute Iraq travel prohibition and sanctions are not necessary to further the government's interest in punishing the Iraq government for invading Kuwait, and violating the human rights of the Iraqi people and international law. Clancy overstates the scope of the travel restriction – the regulation contains three explicit exceptions allowing travel-related restrictions that otherwise would be illegal – it is not an "absolute" ban. *See* 31 C.F.R. § 575.207(c) (excepting travel transactions necessary to effect the departure of a U.S. citizen or permanent resident alien from Kuwait or Iraq; relating to travel and activities for the conduct of the official business of the United States Government or the United Nations; or relating to journalistic activity by persons regularly employed in such capacity by a newsgathering organization). The incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of the key governmental interest in national security and its weighty foreign relations interest. Therefore, applying the *O'Brien* test, this Court concludes that the challenged infringement of First Amendment freedoms is permissible as incidental to the proper, important, and substantial general purpose of the regulations." *See Teague*, 404 F.2d at 446; *accord Karpova*, 402 F. Supp. 2d at 473-74.

Clancy also relies on *Broadrick v. Oklahoma*, 413 U.S. 601, 605 (1973) contending that the Regulations are substantially overbroad. (Pl.'s Br. Opp'n Defs.' Mot. Dismiss or S.J. 28.) "The showing that a law punishes a 'substantial' amount of protected free

speech, "judged in relation to the statute's plainly legitimate sweep," *Broadrick*, 413 U.S. at 601, "suffices to invalidate all enforcement of that law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression,' *id.*, at 613." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003). "The overbreadth claimant bears the burden of demonstrating, "from the text of [the law] and from actual fact," that substantial overbreadth exists." *Hicks*, 539 U.S. at 122. Clancy's one paragraph overbreath argument is based on his own conduct of traveling to Iraq. Clancy has not met the demanding standard of a challenge to the Regulations as being overbroad.

Based on the foregoing, the Court grants summary judgment for the Defendants on Clancy's First Amendment cause of action.

*Article 12 of the ICCPR and Customary International Law - Sixth Cause of Action*

The Defendants maintain that Clancy has no claim under the ICCPR because there is no conflict between the ICCPR and the Regulations. Furthermore, the Defendants state that the ICCPR is not enforceable in federal courts because it is not self-executing.

Clancy asserts that even where a treaty is not self-executing, both federal and state courts have applied customary international law to cases without express legislative action.

The United States is a party to the ICCPR. *Sosa v. Alvarez-Machain,* 542 U.S. 692, 734-35 (2004). Although the ICCPR[14] binds the United States as a matter of international

---

[14]Clancy relies upon Article 12 of the ICCPR which provides in part "everyone shall be free to leave any country, including his own."

law, the United States ratified the covenant on the express understanding that it was not self-executing[15] and so did not itself create obligations enforceable in the federal courts. *Id.*; *see also Beazley v. Johnson*, 242 F.3d 248, 267 (5th Cir. 2001) (regarding habeas corpus petition). Because the treaty is not self executing, it does not give rise to a private cause of action. *Id.*; *Voices in the Wilderness*, 329 F. Supp. 2d at 81.

> While it has long been recognized that '[i]nternational law is part of our law,' and that 'where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations,' *The Paquete Habana*, 175 U.S. 677, 700, . . . (1900),where a controlling executive or legislative act does exist, customary international law is inapplicable, *Committee of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 939 (D.C. Cir. 1988); *Garcia-Mir v. Meese*, 788 F.2d 1446, 1453 (11th Cir. [1986]).

*Galo-Garcia v. I.N.S.*, 86 F.3d 916, 918 (9th Cir. 1996). Clancy's argument regarding the application of customary international law presupposes that he prevailed on his contentions that the travel regulation constitutes a deprivation of fundamental rights, a denial of due process, and is not authorized by underlying statutory authority. He has not.

Because the UNPA, IEEPA, the Executive Orders, and the Iraqi Sanctions Act (which ratifies the Executive Orders), are controlling legislative and executive acts addressing the same subject, customary international law is inapplicable and does not provide a basis for

---

[15]Treaties are typically classified as self-executing or executory. Executory treaties are addressed to the Congress and require congressional action before becoming effective in domestic courts, whereas a self-executing treaty "is one that operates of itself without the aid of legislation." *U.S. v. Lindh*, 212 F.Supp.2d 541, 554 n.20 (E.D. Va. 2002) (citing 74 Am.Jur.2d Treaties § 3).

invalidating the penalties assessed against Clancy. *See id*. Therefore, the Court grants the Defendants summary judgment on Clancy's ICCPR and customary international law claim as a matter of law.

*Reversal of Section 575.205 Violation Finding  -  Seventh Cause of Action*

The Defendants contend that Clancy's APA claim lacks merit because the statute authorizes the Regulations' travel-related restrictions, the OFAC's interpretation of "services" is reasonable, and the OFAC acted reasonably in imposing a civil penalty upon Clancy for violations of the travel-related restrictions. Clancy responds that no statutory authority exists for the OFAC's regulation banning travel per se, the Regulations cannot be construed to prohibit "services" that provide no economic benefit to Iraq or Iraqi entities, and the Regulations are unconstitutional because the term "services" is impermissibly vague. Clancy does not address the imposition of the civil penalty based on his violation of the travel restrictions.

This Court has concluded that § 575.207, is authorized by the IEEPA, the UNPA, and the Iraqi Sanctions Act as well as Executive Orders 12,722, and 12,724. *See infra* at 22-23. Therefore, the Court considers the reasonableness of the OFAC's interpretation of services.

Under the APA, the appropriate standard for review is whether the OFAC's adjudication was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as specified in Section 706(2)(A) of Title 5 of the United States Code. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). In applying that standard, the focal point for judicial review

35

should be the administrative record already in existence, not some new record made initially in the reviewing court. *Id.*

Furthermore, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). An agency's interpretation of its own regulations must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Stinson v. United States*, 508 U.S. 36, 45 (1993); *see also Paradissiotis v. Rubin*, 171 F.3d 983, 988 (5th Cir. 1999); *Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 701 (D.C. Cir. 1994). In matters which involve foreign policy and national security considerations, courts are "particularly obliged to defer to the discretion of executive agencies interpreting their governing law and regulations." *Paradissiotis*, 171 F.3d at 988 (citing *Haig*, 453 U.S. at 292; *Miranda*, 766 F.2d at 3-4).

Section 575.205 states:

> Except as otherwise authorized, no goods, technology (including technical data or other information), or services may be exported from the United States, or, if subject to U.S. jurisdiction, exported or reexported from a third country to Iraq, to any entity owned or controlled by the Government of Iraq, or to any entity operated from Iraq, except donated foodstuffs in humanitarian circumstances, and donated supplies intended strictly for medical purposes, the exportation of which has been specifically licensed pursuant to § 575.507, 575.517 or 575.518.

31 C.F.R. § 575.205.  The OFAC concluded that Clancy's exportation of services violated the Regulations determining that "shielding a Government of Iraq ('GOI') infrastructure from possible U.S. military action constitutes services to the GOI."  (A.R. 0002.)

Clancy maintains that all the authority cited by the Defendants relates to economic relations and that the Defendants cannot point to any evidence that Clancy's actions provided any economic benefit to the Government of Iraq or to any entity operating out of Iraq.  The Defendants contend that acting as a human shield reasonably constitutes "services" and the OFAC's interpretation was upheld in *Karpova*, 402 F. Supp. 2d at 466-67.

The term "service" is not defined in the Regulations.  As such, the Court must defer to the OFAC's interpretation of the term, "even if the agency's reading differs from what the court believes is the best [ ] interpretation."  *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Serv.*, 545 U.S. 967, 980 (2005); *Chevron*, 467 U.S. at 843-44 & n.11.  To be sustained, an agency's interpretation must merely be reasonable.  *Nat'l Cable & Telecomm. Ass'n*, 545 U.S. at 980.  The Court "need not find that its construction is the only reasonable one or even that it is the result [it] would have reached had the question arisen in the first instance in judicial proceedings.*"  Udall v. Tallman*, 380 U.S. 1, 16 (1965).

In considering the reasonableness of an agency's interpretation of terms, the Supreme Court has relied on dictionary definitions.  *See Smiley v. Citibank*, 517 U.S. 735, 745 (1996).   "Service," is defined, in part, as: "[a]n intangible commodity in the form of human effort such as labor, skill, or advice."  *Black's Law Dictionary* 1372 (7th ed. 1999).  Similarly, a definition of  "service" is: "contribution to the welfare of others," "a helpful act" and "useful

labor that does not produce a tangible commodity." Merriam-Webster Online, http://www.webster.com/cgi-b in/dictionary?book=Dictionary & va=service & x=15 & y=24.

The fact that a service does not produce a tangible product is not tantamount to a determination that no economic benefit is provided. One only need consider that the service sector is a major economic force in our country. Protection of Iraq's infrastructure would have an economic benefit. This Court concurs with *Karpova*'s conclusion that "infrastructure protection is an intangible commodity." *See* 402 F. Supp. 2d at 467. Thus, the OFAC could reasonably conclude that acting as a human shield constituted exportation of services in violation of 31 C.F.R. § 575.205. *Id.*; *see also Lindh*, 212 F. Supp. 2d at 562 (providing combatant services to the Taliban and al Qaeda fell within the IEEPA and Regulations).

In considering whether the OFAC's determination that Clancy violated the Regulations by exporting his services to Iraq to serve as a human shield is arbitrary or capricious , the Court considers Clancy's March 7, 2003, statement when he was interviewed by a special agent at Minneapolis International Airport upon returning from Iraq.[16] Clancy stated that he traveled to Iraq to protest the war and act as a human shield for the human shield movement. (A.R. 0047.) As a human shield, Clancy stayed at food storage facilities, hospitals and schools in an attempt to deter the United States from bombing those locations. (A.R. 0048.) In Iraq, Clancy stayed for two or three days at the Andalus Apartments, a hotel in Bagdad. (*Id.*) For the remaining time, Clancy stayed at the Tagi Silo, a food storage facility about 30 to 40 minutes north of Bagdad. (*Id.*, A.R. 0040.) Clancy learned of becoming a

---

[16]The Department of the Treasury United States Custom Service Report of Investigation Continuation indicates that Clancy was advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 467-74 (1966), understood his rights, and waived them before providing the statement. (A.R. 0047.)

38

human shield from a CNN news article. (A.R. 0040.) All information was gained from a website, www.humanshield.org. (*Id.*) The OFAC's determination that Clancy violated the Regulations by exporting a "service" to Iraq is not arbitrary or capricious and, as such, must be upheld.

Clancy also argues that the term "services" is impermissibly vague. Such challenge was raised for the first time in his summary judgment opposition brief. Complaints may not be amended by arguments in briefs submitted in opposition to summary judgment motions. *See Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996). Clancy's vagueness challenge is not properly before the Court. For the reasons stated, the Court grants summary judgment to the Defendants on Clancy's claim requesting reversal of the OFAC's §575.205 finding.

*Separation of Powers – Eighth Cause of Action*

The Defendants maintain that Clancy's challenge to the IEEPA under the non-delegation doctrine constitutes a meritless claim that disregards decades of established case law. While acknowledging the deference commonly afforded to legislative delegations in the context of foreign affairs, Clancy states that the "unusual and extraordinary" threat requirement coupled with the declarations of a national emergency, is not sufficiently intelligible or guiding to justify the delegation claimed by the OFAC under the IEEPA.

"The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371-72 (1989). The Constitution provides that "[a]ll legislative Powers herein granted shall

be vested in a Congress of the United States," U.S. CONST., ART. I, § 1, and the Supreme Court has long insisted that "the integrity and maintenance of the system of government ordained by the Constitution" mandate that Congress generally cannot delegate its legislative power to another Branch. *Mistretta*, 488 U.S. at 371-72 (quoting *Field v. Clark*, 143 U.S. 649, 692 (1892).)  However, the Supreme Court has recognized that the separation-of-powers principle, and the nondelegation doctrine, do not prevent Congress from obtaining the assistance of its coordinate Branches. *Mistretta*, 488 U.S. at 372.  Such legislative action is not a forbidden delegation of legislative powers as long as Congress lays "down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform" *Id*. (citation omitted.)  As stated in *Zemel*,  381 U.S. at 17, "[i]t is important to bear in mind, . . . that because of the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature, Congress – in giving the Executive authority over matters of foreign affairs – *must of necessity paint with a brush broader than that it customarily wields in domestic areas*." (emphasis added).

In *United States  v. Dhafir*,  461 F.3d 211, 215 -16 (2nd Cir. 2006), the appeals court rejected a non-delegation challenge to the IEEPA in the criminal context, upholding the delegation even if a heightened standard is required in the context of criminal offenses.  The court noting that the Supreme Court has upheld Congressional delegation to the executive – under the IEEPA – to nullify certain attachments and transfers of assets. *Id.* (citing *Dames &*

*Moore v. Regan*, 453 U.S. 654, 675 (1981); *Wald*, 468 U.S. at 232-33 (holding that regulations promulgated pursuant to the IEEPA and the TWEA were constitutional); *Zemel*, 381 U.S. 1 (upholding the Passport Act of 1926, which gave the Secretary of State the power to grant and issue passports without setting forth standards to guide the use of his discretion). The appeals court also noted that it and other circuit courts have upheld such delegations. *Dhafir*, 461 F.3d at 216 (citing *Sardino v. Federal Reserve Bank*, 361 F.2d 106, 110 (2d Cir. 1966) (upholding constitutionality of the TWEA); *Freedom to Travel Campaign*, 82 F.3d at 1437-38 (upholding constitutionality of Congress' delegation of authority to renew the Cuban embargo solely upon a determination that it is "in the national interest"); *United States v. Esfahani*, No. 05 Cr 0255, 2006 WL 163025, at *11 (N.D. Ill. Jan.17, 2006) (upholding constitutionality of the IEEPA); *United States v. Anvari-Hamedani*, 378 F. Supp. 2d 821 (N.D. Ohio 2005) (upholding constitutionality of the IEEPA).

        The IEEPA allows the President to exercise economic powers by declaring a national emergency with respect to "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a) The statutory criteria for the President's exercise of his delegated authority provides an "intelligible principle" to which the President is directed to conform. *Mistretta*, 488 U.S. at 372. Thus, this Court concludes that the IEEPA does not violate the nondelegation doctrine.[17] *See Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748,

---

[17] The delegation relies not only on the IEEPA, but also the UNPA.

Case 2:05-cv-00580-RTR   Filed 03/31/07   Page 41 of 42   Document 45

754 (7th Cir. 2003); *Dhafir*, 461 F.3d at 216. Therefore, the Court grants summary judgment to the Defendants on Clancy's separation of powers claim.

        **NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

        The Defendants' motion for summary judgment on their favor on each of Clancy's causes of action (Docket No. 12) is **GRANTED**.

        This action is **DISMISSED**.

        The Clerk of Court **SHALL** enter judgment accordingly.

        Dated at Milwaukee, Wisconsin this 31st day of March, 2007.

                        **BY THE COURT**


                        s/ Rudolph T. Randa
                        **Hon. Rudolph T. Randa**
                        **Chief Judge**

Case 2:05-cv-00580-RTR   Filed 03/31/07   Page 42 of 42   Document 45